**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

WATERKEEPER ALLIANCE, INC., et al.,

    Plaintiffs,

        v.

ANDREW WHEELER, Acting Administrator,
U.S. Environmental Protection Agency, et al.,

    Defendants.

---

Civil Action No. 18-2230 (JDB)

## MEMORANDUM OPINION

Three environmental groups challenge EPA's approval of an Oklahoma program regulating the disposal of coal combustion residuals ("coal residuals" or "coal ash").  Plaintiffs bring two sets of claims: first, a citizen suit alleging that EPA failed to perform its statutory duty to develop and publish minimum guidelines for public participation in the program's approval; and second, claims under the Administrative Procedure Act ("APA") alleging that EPA's approval of the program was arbitrary, capricious, or otherwise unlawful.  The State of Oklahoma, as well as various utility companies, moved to intervene to defend EPA's approval of the program, and the Court granted their motions.  Before the Court are plaintiffs' motion for summary judgment and defendants' and intervenors' cross-motions for summary judgment.  For the reasons stated herein, the Court will grant in part and deny in part each of the parties' motions, granting summary judgment for defendants and intervenors on all but one claim.

### BACKGROUND

#### A. Statutory and Regulatory Landscape

In 1976, Congress passed and President Ford signed into law the Resource Conservation and Recovery Act of 1976 ("RCRA"), Pub. L. 94-580, 90 Stat. 2795 (codified at 42 U.S.C. § 6901),

as an amendment to the Solid Waste Disposal Act, Pub. L. No. 89-272, 79 Stat. 992 (1965).  RCRA established a comprehensive framework for regulating the treatment, storage, and disposal of hazardous and non-hazardous waste.  See Util. Solid Waste Activities Grp. v. EPA, 901 F.3d 414, 420 (D.C. Cir. 2018) (per curiam) [hereinafter USWAG].

Subtitle D of RCRA "calls on the EPA to promulgate criteria distinguishing 'sanitary landfills,' which are permissible under the statute, from 'open dumps,' which are prohibited." Id. (quoting 42 U.S.C. § 6944(a).  In 2015, EPA promulgated federal regulations governing disposal of coal residuals under Subtitle D.  See Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals from Electric Utilities ("2015 Rule"), 80 Fed. Reg. 21,302 (Apr. 17, 2015) (codified at 40 C.F.R. § 257.50).  Coal residuals, or coal ash, "are generated from the combustion of coal . . . for the purpose of generating steam for powering a generator." See Oklahoma: Approval of State Coal Combustion Residuals Permit Program ("Final Authorization"), 83 Fed. Reg. 30,356, 30,356 (June 28, 2018).  Although coal residuals may be put to beneficial use, many are shipped to off-site disposal facilities like landfills or surface impoundments. Id.

In 2016, Congress passed the Water Infrastructure Improvements for the Nation Act ("WIIN Act"), Pub. L. No. 114-322, 130 Stat. 1628 (2016) (codified at 42 U.S.C. § 6945(d)).  The WIIN Act "amended RCRA . . . to allow the EPA to approve State permitting programs 'to operate in lieu of [EPA's federal] regulation of coal . . . residuals units in the State,' provided those programs are at least as environmentally protective as the existing (or successor) EPA regulations." USWAG, 901 F.3d at 426 (quoting 42 U.S.C. § 6945(d)(1)(A)).  EPA issued non-binding guidance "as a technical resource to States that may be useful in developing and submitting a State Coal Combustion Residuals . . . Permit Program to EPA for approval." See U.S. Envtl. Prot. Agency,

EPA-HQ-OLEM-2017-0613-0006, Coal Combustion Residuals State Permit Program Guidance Document; Interim Final, ("Interim Final Guidance") at ii (Aug. 2017). The Guidance Document encourages States to include in their applications a description of their "public participation procedures for permit issuance and post-permit actions," and notes that "EPA . . . believes that an adequate permit program provides for public participation." Id. at 2-3.

In August 2018, the D.C. Circuit vacated and remanded parts of the 2015 Rule, holding inter alia that "EPA acted arbitrarily and capriciously and contrary to RCRA in failing to require the closure of unlined surface impoundments." USWAG, 901 F.3d at 449. Such unlined impoundments, the court determined, failed to meet "RCRA's baseline requirement that any solid waste disposal site pose 'no reasonable probability of adverse effects on health or the environment.'" Id. at 427 (quoting 42 U.S.C. § 6944(a)). The court vacated and remanded that provision, along with two others that it determined were arbitrary and capricious. Id. at 449.

## B. Oklahoma's Program

Oklahoma developed and submitted a proposed permitting program under the amended RCRA on August 3, 2017. See Final Authorization, 83 Fed. Reg. at 30,357. On January 18, 2018, EPA proposed approval of Oklahoma's program by notice in the Federal Register. See Oklahoma: Approval of State Coal Combustion Residuals State Permit Program, 83 Fed. Reg. 2100 (Jan. 16, 2018). Waterkeeper submitted comments opposing the approval. See Earthjustice, Grand Riverkeeper, LEAD Agency, Sierra Club, Tar Creekkeeper, and Waterkeeper Alliance, Comment Letter on Oklahoma: Approval of State Coal Combustion Residuals State Permit Program ("Environmental Comments") at 20–22, 28–32, 35–36, 41–43 (Mar. 19, 2018), https://www.regulations.gov/document?D=EPA-HQ-OLEM-2017-0613-0044. EPA then approved Oklahoma's program on June 28, 2018, with an effective date of July 30, 2018. See

Final Authorization, 83 Fed. Reg. at 30,356.  Oklahoma codified those regulations in law.  See Okla. Admin. Code § 252:517-1-1.

### C. Procedural History

Waterkeeper filed its complaint on September 26, 2018.  Compl. for Declaratory & Injunctive Relief ("Compl.") [ECF No. 1].  It brought two types of claims against EPA.  Count 1, under the citizen-suit provision of RCRA, claims that EPA failed to perform a nondiscretionary statutory duty under RCRA, codified at 42 U.S.C. § 6974(b)(1), to develop and publish minimum guidelines for public participation in the design, implementation, and approval of state CCR programs.  See Compl. ¶¶ 64–72.  Waterkeeper's second set of claims, brought under the APA and set forth in Counts 2 through 7, alleges that EPA's approval is invalid because (1) it permits the continued use of unlined impoundments, which the D.C. Circuit determined to be unlawful in USWAG, id. ¶¶ 73–78; (2) EPA failed to perform its duty to publish guidelines for public participation under 42 U.S.C. § 6974(b)(1), id. ¶¶ 79–88; (3) EPA's approval of the Oklahoma program is inconsistent with the WIIN Act because the Oklahoma program provides for "permits for life," id. ¶¶ 89–98; and (4) EPA failed to respond adequately to two comments raised during the administrative process, id. ¶¶ 99–113.

The Oklahoma Gas and Electric Company ("OG&E"), the State of Oklahoma and the Oklahoma Department of Environmental Quality ("Oklahoma"), and the Public Service Company of Oklahoma ("PSO") and the Utility Solid Waste Activities Group ("USWAG") moved to intervene.  See Mem. in Supp. of Mot. of OG&E to Intervene [ECF No. 12-2] ("OG&E Mot."); Mem. in Supp. of Mot. of USWAG and PSO to Intervene [ECF No. 18-2] ("USWAG & PSO Mot."); The State of Oklahoma's Mot. to Intervene [ECF No. 14] ("Okla. Mot.").  USWAG is an electric utility association that represents over 150 electric utilities, including PSO, and OG&E

and PSO are electric utility companies with coal residuals facilities in Oklahoma.  See OG&E Mot. at 1; USWAG & PSO Mot. at 2–3.  The Court granted the three motions to intervene but cabined intervenors' argument "to the existing claims in this action."  Waterkeeper All., Inc. v. Wheeler, 330 F.R.D. 1, 10 (D.D.C. 2018).

On March 15, 2019, Waterkeeper moved for summary judgment.  Mot. of Pls. Waterkeeper Alliance, Inc., LEAD Agency, Inc., & Sierra Club for Summ. J., and Mem. in Supp. ("Pls.' Mem.") [ECF No. 42].  EPA and intervenors each filed a cross-motion for summary judgment.  Defs.' Cross-Mot. for Summ. J. & Resp. in Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n") [ECF No. 45]; Defs.-Intervenors' Cross-Mot. for Summ. J. & Resp. to Pls.' Mot. for Summ. J. ("Intervenors' Opp'n") [ECF No. 48].  The motions are fully briefed and ripe for resolution.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal."  Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  While courts will usually review cross-motions for summary judgment "with an eye toward finding

genuine dispute[s] as to any material fact[s] that might make summary judgment inappropriate," the function of the district court under APA review "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Ass'n of Private Sector Colls. & Univs. v. Duncan, 110 F. Supp. 3d 176, 184 (D.D.C. 2015) (internal quotation marks omitted), aff'd, 640 Fed. App'x 5 (D.C. Cir. 2016).  "And that question of law is: based on the record, did the agency act in an 'arbitrary' or 'capricious' manner or otherwise violate the law?"  Id.  The Court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

<u>ANALYSIS</u>

## I.   <u>Citizen Suit</u>

In assessing a citizen suit, "[t]he court has jurisdiction only if the EPA has failed to fulfill a nondiscretionary duty."  Defs. of Wildlife v. Jackson, 284 F.R.D. 1, 4 (D.D.C. 2012).  A "nondiscretionary duty" is an obligation whose requirements, such as the deadline for completion, are clearly set forth by law and not left to the discretion of an agency.  See, e.g., Zook v. EPA, 611 Fed. App'x 725, 726 (D.C. Cir. 2015) (per curiam) ("An individual may bring an action against the EPA Administrator under the Clean Air Act's citizen-suit provision 'where there is alleged a failure of the Administrator to perform any act or duty under [the Act] which is not discretionary with the Administrator.'" (quoting 42 U.S.C. § 7604(a)(2)).

Waterkeeper argues that EPA has failed to satisfy its statutory duty under 42 U.S.C. § 6974(b)(1) to publish minimum guidelines for public participation in state coal residuals programs.  Pls.' Mem. at 22–26.  Waterkeeper contends that "EPA's failure to discharge its nondiscretionary duty . . . is in derogation of public participation rights" and necessitates

invalidating the Final Program Approval as a matter of law.  Id. at 21, 25.

EPA responds that the language of § 6974(b)(1) does not set out a nondiscretionary duty to establish guidelines for public participation before approving state coal residuals programs; rather, the statute affords EPA discretion in when and how to implement this requirement.  Defs.' Opp'n at 8–10.  In order to bring suit under the RCRA citizen-suit provision, EPA contends, plaintiffs "must identify a date-certain deadline for EPA to act."  Id. at 8.  For this proposition, EPA cites case law explaining the requirements for bringing suit under the identically worded citizen-suit provision of the Clean Air Act.  Id.  at 8.  Compare 42 U.S.C. § 6972(a)(2) (allowing suit, under RCRA, "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator"), with 42 U.S.C. § 7604(a)(2) (allowing suit, under the Clean Water Act, "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator").  In one of the cases cited, Sierra Club v. Thomas, 828 F.2d 783 (D.C. Cir. 1987), the D.C. Circuit held that, "[i]n order to impose a clear-cut nondiscretionary duty" of timeliness, the Clean Air Act needed to "categorically mandat[e] that all specified action be taken by a date-certain deadline," id. at 791 (internal quotation marks omitted) (alteration in original).

The Court is persuaded that the Clean Air Act cases are sufficiently analogous to the present case to provide persuasive authority.  As EPA notes, § 6974(b)(1) contains no apparent dates or timelines for action:

> Public participation in the development, revision, implementation, and enforcement of any regulation, guideline, information, or program under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States.  The Administrator, in cooperation with the States, shall develop and publish minimum guidelines for public participation in such processes.

42 U.S.C. § 6974(b)(1); see also Defs.' Opp'n at 9.  But the absence of specific dates is not the

end of the inquiry.  Under <u>Thomas</u>, a date-certain deadline "may exist, even though not explicitly set forth in the statute, if it is readily-ascertainable by reference to a fixed date or event," <u>Thomas</u>, 828 F.2d at 791 n.58; <u>see also</u> Pls.' Reply in Supp. of Mot. for Summ. J. & Opp'n to Defs.' & Intervenor-Defs.' Cross-Mots. for Summ. J. ("Pls.' Reply") [ECF No. 49] at 2.  Waterkeeper argues that "dates certain may be clearly discernable in or inferable from the statutory scheme, and need not be explicitly labeled as deadlines."  Pls.' Reply at 2.  RCRA sets out such a "clearly discernable" deadline, the argument goes, by providing that EPA "'<u>shall</u> develop and publish minimum guidelines for public participation' in the 'development, revision, implementation, and enforcement of <u>any</u> regulation, guideline, information, or program.'"  <u>Id.</u> (quoting 42 U.S.C. § 6974(b) (emphasis added)).

The Court finds this reading of § 6974(b)(1) persuasive.  For this provision to have any effect, EPA must "develop and publish minimum guidelines" at least before the agency authorizes a state program, lest they have no practical effect.  At the same time, the Court faces a further question: whether the discernable deadline established by § 6974(b)(1) and the WIIN Act is for a state's <u>submission</u> of its application to run its own permitting program or instead for EPA's final <u>approval</u> of that application.  While the latter event is clearly discernable, the publication of these guidelines seems designed not for EPA's benefit in reviewing state applications, but for states' advantage in formulating their applications.  If states' submissions of their applications is the "discernible event," however, then the mandate under § 6974(b)(1) risks again becoming rather amorphous.

The Court need not decide this question, however, for even assuming that Waterkeeper is correct that § 6974(b) <u>does</u> impose on EPA a nondiscretionary duty to issue guidelines for public participation, EPA satisfied this requirement through its publication of Interim Final Guidance in

August 2017.  <u>See</u> Release of Interim Final Guidance for State Coal Combustion Residuals Permit Programs; Comment Request, 82 Fed. Reg. 38,685 (Aug. 15, 2017); <u>see also</u> Defs.' Opp'n at 13. Therein, EPA noted that "an adequate permit program <u>provides for public participation</u> by ensuring that: (1) Documents for permit determinations are made available for public review and comment; and (2) Final determinations on permit applications are made known to the public[; and] (3) Public comments on permit determinations are considered."  Interim Final Guidance at 2-3.

Waterkeeper argues that this non-binding guidance does not suffice to satisfy § 6974(b)'s requirements.  According to Waterkeeper, the "mandate that EPA develop and publish guidelines is a directive to promulgate enforceable regulations setting out minimum public participation requirements."  Pls.' Reply at 8 (internal quotation marks omitted).  But the plain language of § 6974(b) does not require the promulgation of binding regulations—only the development and publication of "minimum guidelines."  It is not as if Congress does not know how to require the promulgation of regulations when it wants to; indeed, it explicitly did so elsewhere in RCRA, <u>see, e.g.</u>, 42 U.S.C. § 6942(a) (requiring EPA "by regulation [to] publish guidelines for the identification of those areas which have common solid waste management problems"); <u>id.</u> § 6926(a) (requiring EPA to "promulgate guidelines to assist States in the Development of State hazardous waste programs").  And § 6974(b)(1) itself distinguishes between "guidelines" and "regulations" when it lists them separately in describing the various matters for which EPA should promote public participation.  <u>See</u> 42 U.S.C. § 6974(b)(1) ("any regulation, guideline, information, or program under this chapter"); <u>see also</u> Defs.' Opp'n at 11.  That Congress listed both terms in the first sentence of § 6974(b)(1) and then chose to include only "guidelines" in the second sentence strongly suggests that it did not intend to require EPA to create more than non-binding guidance in support of public participation.  <u>See</u> <u>Persinger v. Islamic Republic of Iran</u>, 729 F.2d

835, 843 (D.C. Cir. 1984) ("When Congress uses explicit language in one part of a statute to cover

a particular situation and then uses different language in another part of the same statute, a strong

inference arises that the two provisions do not mean the same thing.").

The case law bolsters this reading of § 6974(b)(1).  Courts have recognized that Congress

uses particular words when referring to binding legal rules.  Use of the word "promulgate" would

have suggested that EPA's guidelines needed to be published in the Federal Register, Horsehead

Res. Dev. Co. v. EPA, 130 F.3d 1090, 1093 (D.C. Cir. 1997), and the addition of the phrase "legal

effect" would have suggested that the guidelines needed to be binding, see Brock v. Cathedral

Bluffs Shale Oil Co., 796 F.2d 533, 539 (D.C. Cir. 1986).  No such words were used in the relevant

provision here, and given the exacting meaning of "regulations" in administrative law, the absence

of the term from the second sentence of § 6974(b)(1) leads the Court to conclude that the Interim

Final Guidance sufficed to satisfy any nondiscretionary obligation.[1]

Count 1 of the complaint, Waterkeeper's citizen suit, thus fails, for even if § 6974(b)(1)

sets forth a nondiscretionary duty to publish public-participation guidelines, EPA has satisfied this

requirement through the publication of the Interim Final Guidance on state permitting programs.

## II.   APA Claims

Waterkeeper also argues that EPA's approval of Oklahoma's coal residuals program was

arbitrary and capricious under the APA.  To that end, Waterkeeper brings six separate claims

---

[1] EPA also argues that it independently satisfied § 6974(b) by issuing general public-participation guidelines that establish "minimum requirements and suggested program elements for public participation in activities under [RCRA]," 40 C.F.R. § 25.1.  Defs.' Opp'n at 14–15.  This argument faces an uphill battle, however, for these regulations do not apply to state permitting programs.  See U.S. Envtl. Prot. Agency, EPA-HQ-OLEM-2017-0613-0073, Comment Summary and Response Document: Oklahoma CCR Permit Program Approval ("Response to Comments") at 9 (June 2018).  Moreover, the language of § 6974(b)(1) appears to require that separate guidelines be developed and published for "any regulation, guideline, information, or program" under RCRA.  42 U.S.C. § 6974(b)(1); see also id. (requiring EPA to "develop and publish minimum guidelines for public participation in such processes" (i.e. any regulation or guidelines)).  Because 40 C.F.R. § 25.1 does not apply to the state programs, it cannot suffice to fulfill this statutory requirement.

challenging the approval of the Oklahoma program.  See Compl. ¶¶ 73–113.  The Court will address each in turn.

### 1. Decision in <u>USWAG</u> Renders Final Program Approval Invalid

Waterkeeper first argues that the Final Program Approval is invalid under RCRA because Oklahoma's coal residuals regulations "contain provisions nearly identical to the provisions vacated by the D.C. Circuit" in <u>USWAG</u>.  Pls.' Mem. at 26; <u>see also</u> Compl. ¶¶ 74–78.  In <u>USWAG</u>, various environmental groups petitioned for review of the 2015 Final Rule setting national minimum criteria for coal residuals disposal units.  The D.C. Circuit partially vacated the 2015 Final Rule, concluding, in relevant part, that "the EPA acted arbitrarily and capriciously and contrary to RCRA in failing to require the closure of unlined surface impoundments."  <u>USWAG</u>, 901 F.3d at 449.  Under the 2015 Final Rule, EPA required that all new impoundments for coal residuals be equipped with a composite lining that prevented leakage of contaminants.  But the Final Rule did not require that existing, unlined surface impoundments be retrofitted with such a lining; rather, the Final Rule allowed such impoundments to "continue to operate until they cause groundwater contamination."  Id. at 427.  The D.C. Circuit concluded that this approach failed to address the "health and environmental harms" of unlined impoundments that were identified in the record, and the court therefore vacated the portion of the Final Rule allowing for the continued operation of unlined impoundments.  Id. at 429–30.

In light of this decision, Waterkeeper argues that EPA's approval of Oklahoma's coal residuals program is invalid because "Oklahoma is home to several [unlined] impoundments . . . , and Oklahoma's regulations will allow them to continue operating unless and until they leak."  Pls.' Mem. at 26.  Waterkeeper argues that this setup violates the WIIN Act, under which state coal residuals programs "must be 'at least as protective as'" their federal analogues.  Id. at 27

(quoting 42 U.S.C. § 6945(d)(1)(B)).  Given that the D.C. Circuit ruled the 2015 Final Rule's wait-and-see approach to be inadequate under RCRA's protectiveness standard, see USWAG, 901 F.3d at 427–30 (concluding that the 2015 Final Rule failed to address RCRA's requirement that there be "no reasonable probability of adverse effects on health or the environment" (quoting 42 U.S.C. § 6944(a)), Waterkeeper contends that EPA's approval of the Oklahoma program, which allegedly takes the same approach, must be set aside.  Pls.' Mem. at 27–28.

EPA appears to concede that Oklahoma's program does not comply with the requirements for unlined impoundments established by RCRA and clarified by the D.C. Circuit in USWAG, but nonetheless argues that "courts should allow the administrative process to play out to allow agencies the first opportunity to address new developments," rather than vacating the Final Program Approval straight out.  Defs.' Opp'n at 30–31.  EPA bases this argument on the statutory structure of the WIIN Act, which requires that EPA review approved state programs within three years of a revision to federal criteria.  42 U.S.C. § 6945(d)(1)(D)(i)(II).  This three-year lag, according to EPA, allows for a previously approved state program to update its standards and make the necessary adjustments.  Defs.' Opp'n at 32.  Given that the WIIN Act imposed a 180-day deadline for EPA to evaluate and act on state program submissions, 42 U.S.C. § 6945(d)(1)(B), EPA argues that it could not have waited on the outcome of any judicial review of the 2015 Final Rule before evaluating Oklahoma's application.  Defs.' Reply in Supp. of Cross-Mot. for Summ. J. ("Defs.' Reply") [ECF No. 51] at 20.  Together with the statutory framework for revising state programs, this timeline suggests, EPA contends, that the proper method for resolving the tension between USWAG and the Oklahoma state program is not to invalidate the latter, but rather to allow for improvements to arise.  Id.

The various intervenors in this action—the State of Oklahoma, Oklahoma Department of Environmental Quality, and several industry and trade groups—echo EPA's argument that "the WIIN Act provides a state with the necessary time to update its CCR program to reflect subsequent changes in federal regulations."  Intervenors' Opp'n at 6–10.  They also argue that, in the event the Court does determine that EPA's approval of the Oklahoma program must be invalidated under USWAG, the agency need not invalidate the entire program, but can invalidate just the parts related to the sections paralleling the holding of USWAG—in particular, the continued use of unlined impoundments absent groundwater impact.  Defs.-Intervenors' Reply in Supp. of Cross-Mot. for Summ. J. ("Intervenors' Reply") [ECF No. 52] at 11–12.

The Court agrees with Waterkeeper that Oklahoma's permitting plan, as approved, contravenes the D.C. Circuit's holding in USWAG, but also concludes that vacating the final approval of the Oklahoma coal residuals program outright is not necessary.  Circuit precedent is clear as to the retroactivity of court decisions:

> Because the decision of an Article III court announces the law as though it were finding it—discerning what the law is, rather than decreeing what it is changed to, or what it will tomorrow be[—]all parties charged with applying that decision, whether agency or court, state or federal, must treat it as if it had always been the law.

Nat'l Fuel Gas Supply Corp. v. FERC, 59 F.3d 1281, 1289 (D.C. Cir. 1995) (internal brackets, ellipses, citations, and quotation marks omitted).  In USWAG, the D.C. Circuit confirmed that the wait-and-see approach to unlined impoundment was contrary to RCRA, and thus vacated that portion of the 2015 Final Rule.  USWAG, 901 F.3d at 430.  Presented with Oklahoma's coal residuals plan that permits a similar practice, see Response to Comments at 4–5, the Court must apply "the controlling interpretation of federal law . . . in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the D.C. Circuit's]

announcement of the rule." <u>Nat'l R.R. Passenger Corp. v. Fraternal Order of Police, Lodge 189</u>, 142 F. Supp. 3d 82, 90 (D.D.C. 2015), <u>aff'd sub nom.</u> <u>Nat'l R.R. Passenger Corp. v. Fraternal Order of Police, Lodge 189 Labor Comm.</u>, 855 F.3d 335 (D.C. Cir. 2017) (quoting <u>Harper v. Va. Dep't of Taxation</u>, 509 US. 86, 97 (1993)).

EPA and intervenors argue that this approach undermines the statutory structure of RCRA and the WIIN Act, which allow states three years to update their programs in light of changes to federal policies.  But this approach in no way reads those provisions out of the statutes or makes them mere surplusage.  Future adjustments to federal regulations will almost certainly require state programs to adjust in turn, but that statutory structure alone does not change the reality that Oklahoma now seeks approval of a state permitting program that includes, at least in principle, <u>see</u> Response to Comments at 4–5, unlined impoundments whose continued existence without intervention was deemed unlawful in <u>USWAG</u>, <u>see</u> 901 F.3d at 430.[2]

But this conclusion does not necessitate vacating the entire authorization for the Oklahoma coal residuals program.  As intervenors suggest, the WIIN Act permits partial program approval, 42 U.S.C. § 6945(d)(1)(B), and the determination that Oklahoma's approach to monitoring unlined impoundments is contrary to RCRA does not require invalidation of the rest of the program. Intervenors' Reply at 12.  To that end, the Court concludes that, in line with the D.C. Circuit's decision in <u>USWAG</u>, EPA's authorization will be partially vacated and remanded.  <u>Cf., e.g.</u>, <u>Sierra Club v. Van Antwerp</u>, 719 F. Supp. 2d 77, 79–80 (D.D.C. 2010) (remanding and partially vacating an agency action).

---

[2] Likewise, the argument that the 180-day turnaround on approving state program applications somehow militates against retroactive application of <u>USWAG</u>, <u>see</u> Defs.' Reply at 20, is unpersuasive.  Under this Court's ruling today, that timeline has continuing relevance for future applications, even if it is assumed that states that chose to apply early may need to adjust their programs in light of judicial review of the 2015 Final Rule.

### 2. Failure to Afford Required Public Participation Opportunities

Waterkeeper next contends that EPA's approval of Oklahoma's coal residuals program is unlawful because the state program fails to afford adequate public participation opportunities.  Pls.' Mem. at 28.  Focusing again on 42 U.S.C. § 6974(b)(1), Waterkeeper argues that all programs under RCRA—including state permitting programs under the WIIN Act—must include "broad public participation opportunities in permitting, modification of permits, rulemaking, and beyond." Pls.' Mem. at 28–29.  Such opportunities for public engagement must be allowed, the argument goes, both for new permits and for "significant modifications" to already issued permits.  Id. at 31.

Waterkeeper claims that Oklahoma's coal residuals program fails to provide adequate opportunities for public participation.  Id. at 32.  It highlights the lack of opportunities for public comment on so-called Tier 1 permits, or permits on "existing coal ash landfills . . . that had already been granted permits by the state prior to EPA's approval of" the coal residuals program.  Id.  In particular, Waterkeeper takes issue with the Oklahoma Department of Environmental Quality's exemption of certain permit modifications from any substantive public participation.  Id. at 33. Under the Oklahoma Uniform Environmental Permitting Act, all permit applications and modifications are classified into one of three categories based on, among other factors, the activity's potential impact on the environment, the amount and type of waste involved, and the "public concern traditionally connected with the type of activity."  Final Authorization, 83 Fed. Reg. at 30,358.  Waterkeeper complains that, while Tier II and Tier III do incorporate some forms of public participation, Tier I activities (the lowest level) do not.  Pls.' Mem. at 32–34.

Moreover, Waterkeeper argues that, even when there is some form of public review and comment on state permits, Oklahoma "fails to ensure that that participation is meaningful."  Id. at 34.  For example, Oklahoma requires that new permit applications include closure plans, which

are subject to public review and comment when those permits are classified as Tier II or Tier III. See Final Authorization, 83 Fed. Reg. at 30,357, 30,363–64. But Waterkeeper complains that permittees may modify their closure plans at any time, and such modifications are classified under Tier I, meaning that front-end public participation can all be for naught if a permittee just modifies its plan after initial approval. See Pls.' Mem. at 34.

As with the citizen-suit claim, however, Waterkeeper's argument is undermined by the general terms of § 6974(b)(1), which affords significant discretion to EPA as to the methods by which it can "provide[] for, encourage[], and assist[]" public participation in the state coal residuals programs. Under such circumstances, EPA's efforts to ensure that the Oklahoma permitting program promotes public participation are sufficient.

To start, EPA has fulfilled whatever duty it may have to "develop and publish minimum guidelines for public participation in" the state coal residuals programs by publishing the Interim Final Guidance. See supra at 8–10 (citing Interim Final Guidance at 2-3). In the case of the Oklahoma permitting program, EPA considered these guidelines as they applied to Oklahoma's application and assessed the various public-participation measures in Oklahoma's permitting programs. See Final Authorization, 83 Fed. Reg. at 30,358–59. These actions are all that is necessary to satisfy RCRA's public-participation requirements in approving Oklahoma's state program.

This Court came to the same determination in City of Dover v. EPA, 956 F. Supp. 2d 272 (D.D.C. 2013), concluding that almost identical language in the Clean Water Act afforded EPA considerable latitude in how to promote public participation. Id. at 283.[3] This Court observed

---

[3] City of Dover concerned EPA's duty under 33 U.S.C. § 1251(e), which reads:

Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter

that, "[a]lthough the EPA must act to promote public participation, it has vast discretion as to the methods it uses to promote participation, and 'a court would have no meaningful standard against which to judge the agency's exercise of discretion.'"   Id. (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)).

None of the cases that Waterkeeper cites to the contrary is persuasive.   In Waterkeeper Alliance, Inc. v. EPA, 399 F.3d 486 (2d Cir. 2005), the court's conclusion that EPA violated the Clean Water Act's specific public-participation requirements turned not on the general language of 33 U.S.C. § 1251(e), which is paralleled in RCRA, but on the specific requirements of 33 U.S.C. §§ 1342(a), (b)(3), (j), which is not paralleled here.   See 399 F.3d at 503.   Although Waterkeeper is correct that the Second Circuit concluded that EPA's failure to afford public participation opportunities violated § 1251(e), Pls.' Reply at 11, the court's reasoning turned "[m]ore specifically" on the other statutory provisions, for which there is no analogue with respect to state coal residuals programs, see Waterkeeper All., 399 F.3d at 503.   Given the extent to which these specific provisions, rather than the general admonition in § 1291(e), guided that court's conclusion, the decision provides little guidance.

Nor is Waterkeeper correct in describing Oklahoma's permitting program as paying mere "lip-service," Citizens for a Better Env't v. EPA, 596 F.2d 720, 726 (7th Cir. 1979), to § 6974(b)(1)'s directive to promote public participation.   See Pls.' Reply at 12.   Under Oklahoma's plan, all Tier II applications require "published notice of the application filing, published notice of the draft permit or denial, opportunity for a public meeting, and submittal of public comment."   Final Authorization, 83 Fed. Reg. at 30,359.   Tier III applications include all the requirements of

---

shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.

Tier II, plus additional "notice of an opportunity for a process meeting (i.e. how the permit process works)." Id. Given the wide discretion afforded by the language of § 6974(b)(1), EPA's approval of such measures—at least for Tiers II and III—seems well within its statutory mandate.

Despite these measures, Waterkeeper focuses on Oklahoma's comparatively limited opportunities for public participation in Tier I decisions and argues that later Tier-I modifications to permits will create a loophole that effectively undermines the entire regime. See Pls.' Mem. at 32–34. But this description mischaracterizes Oklahoma's approach in at least two respects. First, Tier I concerns "those things that are basically administrative decisions which can be made by a technical supervisor," but even so, notice must still be given to the affected landowner. See Final Authorization, 83 Fed. Reg. at 30,358. Thus, the process is not entirely a black box. Second, despite Waterkeeper's assertions otherwise, see Pls.' Mem. at 34, modifications do not necessarily all fall under Tier I. Rather, the Final Authorization requires that such modifications be classified based on the environmental impact of the adjustment. Final Authorization, 83 Fed. Reg. at 30,358. As a result, if a facility applied to adjust its closure to be less protective, then such a modification would be classified as Tier II and require public input. Id. at 30,358–59. In light of the wide discretion afforded to EPA under § 6974(b)(1), approval of these elaborate public participation measures as part of Oklahoma's plan cannot be considered arbitrary or capricious.

Finally, Waterkeeper argues that EPA's approval of Oklahoma's coal residuals program prior to publication of guidelines for public participation violates RCRA and renders the state approval arbitrary and capricious. Pls.' Mem. at 35. Drawing on the analogous regulations for EPA approval of state hazardous waste programs, see 40 C.F.R. Part 256, Waterkeeper contends that Oklahoma's program is deficient for failing to require public hearings on permits of "significant" public interest. Pls.' Mem. at 36. But this argument fails because, as explained

above, RCRA does not require EPA to promulgate regulations prior to the approval of state programs under the WIIN Act.  See supra at 5–8.  And insofar as any requirement does exist, EPA has satisfied its duty by publishing minimum guidelines before approving the Oklahoma coal residuals program.  See Interim Final Guidance at 2-3.  Waterkeeper's argument from the regulations setting out public-participation requirements for state solid waste management programs is also unavailing because, as Waterkeeper itself acknowledges, those regulations do not concern coal residuals programs.  See Pls.' Mem. at 36–37.

### 3. Illegality of "Permits for Life"

Waterkeeper's third APA challenge concerns Oklahoma's approval of so-called "permits for life."  Under the WIIN Act, state coal residuals programs must be "at least as protective as" their federal analogues to be approved by EPA.  See 42 U.S.C. § 6945(d)(1)(B), (C).  The federal standards in this comparison are benchmarked, by statute, to "the applicable criteria for coal combustion residuals units under" 40 C.F.R. Part 257.  See 42 U.S.C. § 6945(d)(1)(B)(i).  State programs have an ongoing duty to satisfy this requirement, and if the federal requirements change, EPA must review each state program within three years to confirm that it "continues to ensure that each coal . . . residuals unit located in the State" complies.  Id. at § 6945(d)(1)(D)(i)(II), (ii)(I).  If the state program fails to align its standards with the revised federal requirements, EPA must withdraw approval of the state program until it "correct[s] the deficiencies."  Id. § 6945(d)(1)(E).

Waterkeeper argues that EPA's approval of Oklahoma's coal residuals program violates these requirements by granting "permits for life," "with no obligation to increase protections consistent with strengthened federal or state requirements."  Pls.' Mem. at 37–38.  According to Waterkeeper, "Oklahoma's program freezes permits in time, holding ash dump operators only to those standards in effect at the time of permit issuance" and not requiring further updates for

developments in technology or science.  Id. at 38;  see also Response to Comments at 12 ("With

the exception of an . . . enforcement action to revoke a facility's permit, a facility's permit will not

terminate until the facility successfully completes closure, post-closure and any corrective action

requirements.").  The State of Oklahoma concedes as much.  Intervenors' Opp'n at 11 ("Oklahoma

law does provide that '[p]ermits shall be issued for the life of the [coal residuals] unit.'" (quoting

Okla. Admin. Code § 252:517-3-1(A)).  But the State emphasizes that these permits "for the life

of the [coal residuals] unit" do not give permittees carte blanche to operate their units however

they like; rather, they are the start of "a regulatory relationship."  Intervenors' Opp'n at 10–11.

Waterkeeper's argument fails for two reasons.  First, Waterkeeper reads too much into the

WIIN Act's requirement that the state program "be at least as protective" as its federal analogue.

42 U.S.C. § 6945(d)(1)(B).  Neither the text of the WIIN Act nor EPA's guidance on approving

state permitting programs, see Interim Final Guidance at 2-3 to -4, requires that a state pass a law

or promulgate a regulation explicitly tying its coal residuals program standards to the federal

requirements.  Rather, the WIIN Act leaves the task of determining whether a state program is

adequately protective to EPA.  See 42 U.S.C. § 6945(d)(1)(B).  And neither the WIIN Act nor the

Interim Final Guidance explicitly forbids "permits for life."

It also seems that the name "permits for life" suggests a more laissez-faire approach than

is actually practiced in Oklahoma.  Despite describing its permits as "issued for the life of the

given [impoundment] site," U.S. Envtl. Prot. Agency, EPA-HQ-OLME-2017-0613-0055

Oklahoma Department of Environmental Quality (ODEQ) Process Response Clarifications, at 20

(June 2018), these permits are not exempt from all future revision.  Under Oklahoma law,

"permittees are subject to the laws and rules of the [Department of Environmental Quality] as they

exist on the date of filing an application and afterwards as changed."  Okla. Admin. Code § 252:4-

7-3.  Indeed, Oklahoma has previously required exactly what Waterkeeper claims "permits for life" prevent: the updating of existing permits based on changes to Oklahoma's laws around coal residuals after the federal 2015 Final Rule.  See id. § 252:517-1-7(b)(2) (requiring the submission within 180 days of a "permit modification application . . . to ensure compliance with" Oklahoma's coal residuals regulations).  In short, although "permits for life" may ease administrative requirements around renewing permits or the like, Oklahoma's program nevertheless mandates continual compliance with state regulations, which in turn must track federal standards lest the state permitting program's approval be withdrawn, see 42 U.S.C. § 6945(d)(1)(D).

Waterkeeper retorts that the "one-time update" after the promulgation of the state coal residuals regulations only highlights the absence of "periodic and ongoing updates to the permits in the future."  Pls.' Reply at 22.  But as much as Waterkeeper may wish for this fluid setup, such an arrangement is not mandated by the WIIN Act or any binding regulations.  Waterkeeper also argues that, unless Oklahoma has the continuous "authority to impose requirements for [coal residual] units adequate to ensure compliance with regulations at least as protective as" their federal analogue, then EPA cannot assure itself that the approved state program is in line with federal standards.  Id. at 23–24 (internal quotation marks omitted).  But, again, this reading imposes an immediacy on state compliance with adjustments to federal standards that is not present in the WIIN Act.  Section 6945(d)(1)(B) does not index the at-least-as-protective standard to mere EPA guidance or some mercurial body of law.  Rather, it requires that state programs be at least as protective as 40 C.F.R. Part 257.  42 U.S.C. § 6945(d)(1)(B)(i).  Given the formalities required to promulgate or adjust a regulation, the federal benchmarks here will not be fast-moving standards.  See also id. § 6912(b) (requiring EPA to "review[] and, where necessary, revise[]" its regulations "not less frequently than every three years").  Oklahoma has also demonstrated the capacity and

willingness to require permit modifications when such changes do arise.  See Okla. Admin. Code § 252:517-1-7(b)(2).

Considering the discretion that reviewing courts give to agencies' "reasoned and rational" choices, the Court must defer to EPA's determination that the potential for lag does not make Oklahoma's program less protective than its federal analogue.  See Cooper v. Nat'l Transp. Safety Bd., 660 F.3d 476, 481 (D.C. Cir. 2011) (internal quotation omitted).  The Court concludes, then, that Oklahoma's so-called "permits for life" are acceptable under the WIIN Act and its own regulatory scheme for coal combustion residuals.

### 4. Failure to Respond to Comments

Finally, Waterkeeper brings two claims based on EPA's alleged failure to respond to significant comments it submitted during the notice-and-comment period.  Pls.' Mem. at 40–41; see also Compl. ¶¶ 100–07, 109–13.  Agencies have a duty to "consider and respond to significant comments received during the period for public comment" on a proposed rule.  Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1203 (2015).  "Although EPA is not required to discuss every item of fact or opinion included in the submissions it receives in response to a Notice of Proposed Rulemaking, it must respond to those comments which, if true, would require a change in the proposed rule."  Genuine Parts Co. v. EPA, 890 F.3d 304, 313 (D.C. Cir. 2018) (internal quotation marks omitted).

Waterkeeper submitted two comments.  First, it argued that  "EPA may not proceed with final approval of Oklahoma's [coal residuals] program—and should not have tentatively approved the state's [coal residuals] program—unless and until it promulgates formal guidelines specifying the public participation opportunities that states must afford."  Environmental Comments at 41. Second, Waterkeeper commented that Oklahoma's "grant of a permit for life is not permissible

under the WIIN Act."  Id. at 21.  Waterkeeper contends that EPA failed to address the substance

of both comments, either of "which, if true, would require a change in the proposed rule," Genuine

Parts Co., 890 F.3d at 313 (quotation omitted).

Neither of these arguments is persuasive.  Waterkeeper's first argument is just another

repackaging of its claim in the citizen suit that EPA must first promulgate formal guidelines for

public participation in state coal residuals programs before approving state applications.  As

discussed above, it is unclear whether such a requirement exists, and if it did, EPA satisfied the

need for "guidelines" through its publication of various criteria for public participation in the

Interim Final Guidance, see Interim Final Guidance at 2-3.  See supra at 8–10.  EPA's response to

Waterkeeper's comment hits on this very point, noting that the WIIN Act "does not require EPA

to promulgate regulations for determining the adequacy of state programs."  Response to

Comments at 14.

Waterkeeper argues that this response is unsatisfactorily "conclusory" and fails to provide

"a reasoned explanation for [EPA's] decision."  Pls.' Mem. at 42 (quoting Int'l Union, United

Mine Workers of Am. v. Mine Safety & Health Admin., 626 F.3d 84, 94 (D.C. Cir. 2010)).  But,

as EPA notes, "[a]n agency's obligation to respond . . . is not particularly demanding"  Ass'n of

Private Sector Colls. & Univs. v. Duncan, 681 F.3d 427, 441 (D.C. Cir. 2012) (internal quotation

marks omitted).  Rather, "the agency's response to public comments must at least 'enable [the

court] to see what major issues of policy were ventilated . . . and why the agency reacted to them

as it did.'"  Am. Coll. of Emergency Physicians v. Price, 264 F. Supp. 3d 89, 94 (D.D.C. 2017)

(quoting Auto. Parts & Accessories Ass'n v. Boyd, 407 F.2d 330, 338 (D.C. Cir. 1968)).  EPA did

just that in its response by explaining the legal basis for not promulgating regulations for public

participation in state programs.  While International Union, United Mine Workers of America

involved an agency's response to "a central factual dispute where there is considerable evidence in conflict," 626 F.3d at 94, the comment here concerned a legal question, and EPA's response adequately explained the agency's reasoning.

Likewise, EPA adequately addressed Waterkeeper's comment concerning Oklahoma's use of permits for life.  As discussed above, Oklahoma's "permits for life" do not contravene the WIIN Act's requirement that state programs be as protective of human life and the environment as their federal analogues, and Oklahoma's coal residuals program allows for updating such permits in line with changes to federal standards.  See supra at 19–22.  EPA laid out the heart of this point in its response, explaining that "Oklahoma's program ensures there will be continued regulatory oversight throughout" the life of a permit.  Response to Comments at 12.  Waterkeeper focuses on the line in the response that "nothing in the Federal rule prohibits such permits," id. (emphasis added), and argues that EPA failed to respond to its comment, given that the agency's actual reasoning is based on the text of the WIIN Act.  See Pls.' Mem. at 42.  Once again, however, Waterkeeper's critique is unpersuasive because EPA did present the core aspects of its reasoning. That the focus of its analysis has shifted from the 2015 Final Rule to the WIIN Act does not provide a basis for setting aside the approval of Oklahoma's program.  And even if it were an error for the agency to have cited the "Federal rule," rather than the WIIN Act itself, such an error was harmless; the absence of a specific citation of the WIIN Act in EPA's response hardly prejudiced Waterkeeper in its challenge.  See FBME Bank Ltd. v. Lew, 209 F. Supp. 3d 299, 311 (D.D.C. 2016).  In sum, neither of EPA's responses to Waterkeeper's comments was so deficient as to provide a basis for invalidating the state program approval.

## CONCLUSION

For all the foregoing reasons, [45] EPA's cross-motion for summary judgment and

[48] intervenors' cross-motion for summary judgment will both be granted with respect to all but Count 2 of the complaint, plaintiffs' challenge to the lawfulness of the final authorization in light of the D.C. Circuit's decision in <u>USWAG</u>.  Accordingly, [42] plaintiffs' motion for summary judgment will be granted with respect to Count 2 and denied with respect to all other counts.  In line with the D.C. Circuit's decision in <u>USWAG</u>, EPA's authorization will be partially vacated and will be remanded to EPA for further consideration.  A separate order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated:  <u>April 15, 2020</u>